UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------- X

MARIA RAND, et al.,

                    Plaintiffs,
                                            **REPORT AND**
        -against-                           **RECOMMENDATION**

VOLVO FINANCE NORTH AMERICA, et al.,        04-CV-349 (DLI)(KAM)

                    Defendants.

--------------------------------------- X

**MATSUMOTO, United States Magistrate Judge:**

          Plaintiffs Maria Rand, her husband, Archie Rand, and
their son, Benjamin Rand (collectively, "plaintiffs" or "the
Rands") commenced this action on or about December 22, 2003 in
New York state court against Volvo Finance North America, Inc.
("Volvo") and Melanie Stern, alleging that Maria and Benjamin
Rand were injured in a collision with a vehicle driven by
defendant Melanie Stern and owned by Volvo.  Maria Rand and
Benjamin Rand seek damages for the personal injuries they allege
to have suffered.  Maria Rand also seeks damages for the value of
the automobile which Benjamin Rand was driving and in which she
and her husband were passengers.  Archie Rand seeks damages for
the loss of society, services and consortium of his wife as a
result of her injuries.

          The action was removed to this Court by defendant
Melanie Stern on January 29, 2004.  (Docket no. 1.)  Defendants

-1-

have moved for, and plaintiffs oppose, summary judgment on the grounds that plaintiffs Maria Rand and Benjamin Rand have not sustained a serious injury within the meaning of New York State Insurance Law § 5102(d). (Docket nos. 24-29.) By order dated October 23, 2006, the Honorable Dora L. Irizarry referred the defendants' motion for summary judgment to the undersigned for a Report and Recommendation. For the reasons set forth herein, the Court respectfully recommends that defendants' motion for summary judgment be denied.

## I. BACKGROUND

On July 24, 2003, the Rands were involved in a car accident in Manhattan with a vehicle operated by Stern and owned by Volvo. (Docket no. 28, Plaintiffs' Local Rule 56.1 Statement ("Pltfs' Rule 56.1 Stmt") ¶ 2.) At the time of the accident, Benjamin Rand was operating the vehicle, which was owned by his mother, and Maria Rand and Archie Rand were passengers in the vehicle. (Defts' Ex. C, Deposition of Maria Rand dated Nov. 3, 2004 ("Maria Rand Depo.") at 19-20.) Maria Rand's and Benjamin Rand's alleged injuries are discussed separately below.

### A.   Maria Rand

Following the accident on July 24, 2003, Maria Rand was transported by ambulance to St. Vincent's Hospital, where she

received x-rays.  (Id. at 54, 57-58.)  Although the x-rays
revealed that Maria Rand had not broken any bones, she was given
a neck brace and sling for her arm and told to follow up with her
primary care doctor.  (Id. at 60-61.)  Maria Rand saw her primary
care physician, Dr. Heller, in August or September 2003,
complaining of headaches, and pain on her rib cage and right arm.
(Id. at 66-68.)  Dr. Heller referred her to a neurologist, Dr.
Willer, who took an MRI of her spine and performed neurological
testing.  (Id. at 63, 66-72.)[1]  Dr. Heller also directed her to
undergo physical therapy, which she received for her middle back
and right arm at Masfield Therapy for approximately two months.
(Id. at 73-75.)  She then began receiving physical therapy,
acupuncture, and chiropractic treatment for her back and right
arm at AB Medical.  (Id. at 76-79.)  Her treatment at AB Medical
lasted approximately three months.  (Id. at 80.)  Maria Rand also
saw a psychotherapist for approximately three months for anxiety
following the accident.  (Id. at 81-88.)  She also received
massage therapy for her right arm and back until about November
2003.  (Id. 88-90.)

At the time of the accident and continuing to the
present, Maria Rand was the curator and art director of the

---

[1]  Because neither plaintiffs nor defendants have provided
the Court with the records of plaintiffs' treating physicians
concerning any medical treatment received after the accident, the
Court relies on the deposition testimony of Maria and Benjamin
Rand regarding the treatment they received.

Brooklyn College art gallery.  (Docket no. 26, Maria Rand Declaration in Opposition to Motion for Summary Judgment ("Maria Rand Decl.") ¶¶ 6-12.) As a result of the accident, Maria Rand states that she has been unable to perform certain functions of her job, including hanging and displaying art, and attending gallery openings.  (<u>Id.</u>)  She has also been hampered in her separate role as the manager for her husband's art career.  (<u>Id.</u> ¶¶ 12, 29-30.)

In support of their motion, defendants have submitted the affirmed reports of two physicians, Dr. Richard Lechtenberg, a neurologist, and Dr. Menachem Epstein, an orthopedist, both of whom examined Maria Rand on December 20, 2004.  (Annexed as Exs. E and F to Defendants' Motion for Summary Judgment.)  Dr. Lechtenberg reviewed certain of Maria Rand's medical records, including the records of Dr. Anwar and Dr. Milaradovich; EMG and nerve conduction studies; and physical therapy, acupuncture and chiropractic records.  Dr. Lechtenberg's report states that Maria Rand had a normal range of motion of the cervical and lumbar spine in flexion, extension, right and left rotation, and lateral bending, and a normal range of motion at the shoulders.  Dr. Lechtenberg's diagnosis states: "My impression is that this claimant may have sustained spine sprains and blunt trauma to the right arm and shoulder at the time of the alleged accident, but currently the claimant has no substantial neurologic deficits."

The report concludes: "Based on my examination of the claimant, my review of the submitted records, my clinical experience and relevant research experience, I believe that the claimant does not have a neurologic condition caused by the accident."

Dr. Epstein's report is based on MRIs of Maria Rand's spine dated August 19, 2003 and September 10, 2003; the physiatrist evaluation of Dr. Jeffrey Schwartz dated September 30, 2003, with a follow-up note dated December 10, 2003; EMG/NCV studies performed by Dr. Justin Willer dated September 3, 2003; and physical therapy, acupuncture and chiropractor notes from September through November 2003. Dr. Epstein notes normal ranges of motion for Maria Rand's spine and for her right and left shoulders, elbows and wrists. Dr. Esptein's diagnosis is "Resolved cervical and lumbosacral soft tissue sprains, superimposed on pre-existing degenerative spine disease." He states: "In my opinion, Ms. Rand has not sustained any permanent injuries or permanent disability because of the above-mentioned accident. The prognosis is good. There is no necessity for further treatment in my specialty. There are preexisting degenerative spine changes, however they did not affect Ms. Rand's recovery for the injuries sustained on July 24, 2003."

In opposition to defendants' motion for summary judgment, plaintiffs have provided the affirmed reports of Dr. Irving Friedman, a neurologist who examined Maria Rand on June 1,

2006, and Dr. Leonard Bleicher, a doctor of physical medicine who examined Maria Rand on June 8, 2005. (Reports annexed as Exs. C and E to Maria Rand Decl.) Dr. Friedman reviewed the medical records of Drs. Vadim Miloradovich and Jeffrey Schwartz from September through November 2003; MRIs of her spine dated August 14, 2003 and September 4, 2003; and a chiropractic report dated September 30, 2003. Dr. Friedman's impression was that as a result of the July 24, 2003 accident, Maria Rand sustained the following "deficits": (1) chronic post-traumatic cervical myofascitis/spasm with right-sided radiculopathy; (2) aggravation and exacerbation of prior totally clinically silent cervical multi-level disc osteophyte complexes with neural foramenal narrowing at C3-C4, C4-C5, C5-C6 and C6-C7; (3) chronic post-traumatic thoracic myofascitis/spasm; (4) post-traumatic cephalgia; (5) post-traumatic right shoulder syndrome; and (6) chronic pain syndrome with affective disturbances including anxiety and depression. As part of his physical exam, Dr. Friedman noted that: "Cervical flexion and extension were guarded to 30 degrees out of 45. Cervical rotation was guarded to 60 degrees out of 90 right and left, i.e. diffuse 33% deficit at the cervical spine with passive and active range of motion."

Regarding Maria Rand's degree of disability, Dr. Friedman stated: "Mrs. Rand remains with a significant and painful and multi-level disability at this time. She remains

grossly symptomatic 2 years and 10 months following her injuries, especially at the cervical spine and the right upper extremity." He noted that Maria Rand's neuro-spinal deficits were directly and causally related to the injuries she sustained on July 24, 2003, and that they were to be considered permanent in nature. Although he noted that her MRI abnormalities throughout the cervical spine were degenerative in nature and were present prior to the July 24, 2003 accident, he states that Maria Rand was totally asymptomatic prior to July 24, 2003 and that: "She became acutely symptomatic at that time and has persistent cervical multi-level clinical root dysfunction. Had [she] not been injured on July 24, 2003, she would have been totally asymptomatic at this point at the cervical spine." Dr. Friedman states that her prognosis for any further functional improvement is poor.

As part of his examination, Dr. Bleicher reviewed a follow-up evaluation by Dr. Anwar on December 10, 2003; a report of the upper extremities NCS/EMG on September 3, 2003; and reports of the brain, cervical and thoracic spine MRIs. He conducted range of motion examinations of Maria Rand's spine and right shoulder, noting the following restrictions: lumbosacral spine, right side flexion, 10 degrees out of a normal 15 to 20 degrees; and right shoulder, internal rotation, 40 degrees out of a normal 60 to 100 degrees. Dr. Bleicher's impression was that

"there is a causal relationship of the patient's symptomocomplex
with the [July 24, 2003 accident] when she sustained injuries to
the forehead/brain, right chest wall, right shoulder, right
elbow, left hip, right ankle, cervical and lumbosacral spine
creating motor units malfunctioning and nerve injuries leading to
the accelerated post-traumatic osteoarthritis, muscular weakness
and atrophy." He stated that, in his opinion, "Maria Rand
suffers from numerically and objectively determined restrictions
of range of motion of the right shoulder, cervical and lumbar
spine, and excessive laxity in the right ankle," which were
causally related to the July 24, 2003 accident. He concluded
that "Her musculoskeletal conditions represent partial permanent
disability, she can expect chronic pain with exacerbations
affecting activities of daily living and her quality of life is
impaired."

**B.    Benjamin Rand**

Following the accident on July 24, 2003, Benjamin Rand
left the scene of the accident with the tow truck transporting
his mother's automobile to Brooklyn, then traveled to St.
Vincent's Hospital, but did not receive any significant medical
treatment there. (Defts' Ex. D, Deposition of Benjamin Rand
dated Nov. 3, 2004 ("Benjamin Rand Depo.") at 57-60.) About two
weeks after the accident, he saw Dr. Hellman, complaining of a

stiff back, pain in his left shoulder, and tingling in his arms
and feet.  (Id. at 63-64.)  Dr. Hellman referred him to Dr.
Willer, who performed nerve tests.  (Id. at 65-67.)  Dr. Willer
also took MRIs of Benjamin Rand's head, back and shoulder, and
referred him to a spine specialist, Dr. Swab.  (Id. at 66-68.)
Benjamin Rand began physical therapy and massage therapy about
one month after the accident at Masfield Therapy, which he
visited for about two months.  (Id. at 73-75.)  He then switched
to AB Medical, where he received physical therapy, acupuncture,
and chiropractic services for about two and a half months.  (Id.
at 75-77, 80.)

      At the time of the accident, Benjamin Rand was self-
employed as an entrepreneur.  (Docket no. 25, Benjamin Rand
Declaration in Opposition to Motion for Summary Judgment
("Benjamin Rand Decl.") ¶ 6.)  He has been working as an
elementary school teacher from the fall of 2004 to the present.
(Id.)  He states that after the July 24, 2003 accident, he was
confined to bed for at least two weeks.  (Id.)  As a result of
the accident, he states that he is unable to participate in
recreational physical activities, including weight lifting, which
he previously pursued, and he is unable to lift items such as
groceries or school books.  (Id. ¶¶ 7-8.)  Benjamin Rand states
that he has back pain and pain in his left arm, which makes it
difficult to sleep or sit for prolonged periods, and he has

severe headaches.  (Id. ¶ 8.)

In support of their motion, defendants have submitted
the affirmed reports of Drs. Lechtenberg and Epstein, who
examined Benjamin Rand on January 17, 2005.  (Annexed as Exs. G
and H to Defendants' Motion for Summary Judgment.)  Dr.
Lechtenberg reviewed records from Drs. Nieto and Silver; and MRIs
of the cervical spine and left shoulder.  Dr. Lechtenberg's
impression was that Benjamin Rand "may have sustained cervical
and lumbar spine sprains and blunt trauma to the limbs at the
time of the alleged accident on July 24, 2003, but currently he
has no neurologic deficits."  He stated that there was no need
for further neurologic treatment or testing, and there were no
permanent neurologic deficits as a consequence of the July 24,
2003 accident.  Dr. Lechtenberg noted that range of motion of the
limbs and spine was normal.

Dr. Epstein reviewed the neurosurgery evaluation of Dr.
Jaime Nieto dated September 4, 2003; initial consultation of Dr.
Silver dated August 12, 2003; and office notes of Dr. Helman for
December 24 and 27, 2002 and July 30, 2003.  Dr. Epstein's
diagnosis was "resolved cervical and lumbosacral spine sprains,
resolved left shoulder sprain."  He stated that there were no
abnormal objective orthopedic findings, and that in his opinion
Benjamin Rand had not sustained any permanent injuries or
permanent disability because of the July 24, 2003 accident.  Dr.

Epstein's report did note reductions in the ranges of motion of the spine: the cervical spine had flexion of 30 degrees out of a normal 45 degrees, extension of 30 degrees out of a normal 45 degrees, lateral bending of 30 degrees out of a normal 45 degrees, and lateral rotation of 60 degrees out of a normal 80 degrees, with complaints of pain; the lumbosacral spine had flexion of 70 degrees out of a normal 90 degrees, extension of 20 degrees out of a normal 30 degrees, lateral bending of 20 degrees out of a normal 30 degrees, and rotation of 20 degrees out of a normal 30 degrees.

Plaintiffs have provided the affirmed report of Dr. Bleicher, who examined Benjamin Rand on August 29, 2005. (Report annexed as Ex. B to Benjamin Rand Decl.) As part of his examination, Dr. Bleicher conducted range of motion examinations of Benjamin Rand's spine, left shoulder, and right knee, noting the following restrictions: lumbosacral spine, left side flexion, 10 degrees out of a normal 15 to 20 degrees; left shoulder joint, elevation through abduction, 160 degrees out of a normal 170 to 180 degrees, and external rotation, 70 degrees out of a normal 80 to 90 degrees. Dr. Bleicher's impression was that "there is a causal relationship of the patient's symptomocomplex with the [July 24, 2003 accident] when he sustained injuries to the left shoulder, left wrist, right knee, cervical and lumbosacral spine creating motor units malfunctioning and nerve injuries leading to

the accelerated post-traumatic osteoarthritis, muscular weakness and atrophy." He stated that, in his opinion, "Benjamin Rand suffers from numerically and objectively determined restrictions of range of motion of the left shoulder, right knee, cervical and lumbar spine," which were causally related to the July 24, 2003 accident. He concluded that "The patient can expect chronic pain with exacerbations affecting activities of daily living due to permanent partial residual disability."

## II. DISCUSSION

As a preliminary matter, as plaintiffs note, the moving defendants have failed to comply with Local Civil Rule 56.1, which mandates, in relevant part, that upon a motion for summary judgment, the moving party shall submit "a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried. Failure to submit such a statement may constitute grounds for denial of the motion."

Defendants failed to explain their failure to comply with Local Civil Rule 56.1, or to rectify their omission by submitting a Local Civil Rule 56.1 statement with their reply, despite having been previously warned by Judge Irizarry to comply with court orders and court rules (<u>see</u> Order dated 2/23/06). Instead, in response to plaintiffs' correct position that

defendants' failure to submit a Local Civil Rule 56.1 statement

provides a ground to deny the motion, and in response to

plaintiffs' Local Civil Rule 56.1 statement, defendants, in their

reply affirmation, claim that defendants' "evidence submitted

from deposition transcripts, plaintiffs' responses to

interrogatories and the sworn medical reports . . . clearly

indicate that **there are issues in the present action as to**

**whether or not plaintiffs Maria Rand and Benjamin Rand have met**

**the threshold of New York Insurance Law § 5102(d)."** (Docket no.

29, Defts' Reply Aff. ¶ 3)(emphasis added). Not only have

defendants, perhaps inadvertently, conceded that their motion

should fail, but they miss the point of a Local Civil Rule 56.1

statement despite quoting the Second Circuit's apt explanation

for the rule:

> The purpose of Local Rule 56.1 is to
> streamline a consideration of summary
> judgment motions by freeing District Courts
> from the need to hunt through voluminous
> records without guidance from the party.

Holtz v. Rockefeller & Co., 258 F.3d 62, 74 (2d Cir. 2001)

(citations omitted).

Here, in support of their summary judgment motion,

defendants submitted plaintiffs' responses to interrogatories,

deposition transcripts and verified statements from defendants'

medical experts, and expect the Court to "hunt through" their

submission, "without guidance" from defendants as to which facts

-13-

they deem material and not in dispute.  Although this Court is
very troubled by defendants' unexplained and repeated failure to
comply with Local Civil Rule 56.1, and would be well within its
discretion to recommend denial of the motion because of
defendants' repeated failures, the Court nonetheless will
exercise its discretion to decide the motion on the record
submitted.


**A.    Summary Judgment Standard**

A court may grant summary judgment only "if the
pleadings, depositions, answers to interrogatories, and
admissions on file, together with the affidavits, if any, show
that there is no genuine issue as to any material fact and that
the moving party is entitled to a judgment as a matter of law."
Fed. R. Civ. P. 56(c).  The moving party carries the burden of
demonstrating the absence of a genuine issue of material fact.
Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  In deciding
a motion for summary judgment, the court's function is not to
resolve disputed issues of fact, but only to determine whether
there is a genuine issue to be tried.  Anderson v. Liberty Lobby,
Inc., 477 U.S. 242, 249 (1986).  The court must construe the
facts in the light most favorable to the nonmoving party and all
reasonable inferences and ambiguities must be resolved against
the moving party.  Flanigan v. Gen. Elec. Co., 242 F.3d 78, 83

(2d Cir. 2001).

Nevertheless, the nonmoving party cannot rest on "mere allegations or denials" but must instead "set forth specific facts showing there is a genuine issue for trial." Fed. R. Civ. P. 56(e); see also National Westminster Bank USA v. Ross, 676 F. Supp. 48, 51 (S.D.N.Y. 1987) ("Speculation, conclusory allegations, and mere denials are not enough to raise genuine issues of fact."); Harlen Assocs. v. Incorporated Vill. of Mineola, 273 F.3d 494, 499 (2d Cir. 2001) ("[M]ere speculation and conjecture is [sic] insufficient to preclude the granting of the motion.").

Nor can the nonmoving party rest only on the pleadings. Celotex, 477 U.S. at 324 (Fed. R. Civ. P. 56(e) "requires the nonmoving party to go beyond the pleadings"); Davis v. New York, 316 F.3d 93, 100 (2d Cir. 2002). Instead, each statement of material fact by the movant or opponent must be followed by citation to evidence which would be admissible, as required by Fed. R. Civ. P. 56(e) and Local Civil Rule 56.1(d). Moreover, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson, 447 U.S. at 247-48 (emphasis in original). No genuine issue of material fact exists "unless there is sufficient evidence favoring the nonmoving party for a

jury to return a verdict for that party.  If the evidence is merely colorable, . . . or is not significantly probative, . . . summary judgment may be granted."  <u>Id.</u> at 249-50 (internal citations omitted).

**B.  Serious Injury Analysis under New York's No-Fault Insurance Law**

New York's No-Fault Insurance Law provides that in an action "for personal injuries arising out of negligence in the use or operation of a motor vehicle in this state, there shall be no right of recovery for non-economic loss, except in the case of a serious injury . . . ."  N.Y. Ins. Law § 5104(a)(McKinney 2007).  This threshold requirement requires "objective proof" of the plaintiff's injury in order to weed out claims based on minor injuries.  <u>Toure v. Avis Rent A Car Systems, Inc.</u>, 98 N.Y.2d 345, 350 (2002); <u>Dufel v. Green</u>, 84 N.Y.2d 795, 798 (1995).  The No-Fault Insurance Law defines "serious injury" as a personal injury which results in:

   (1)  death;
   (2)  dismemberment;
   (3)  significant disfigurement;
   (4)  a fracture;
   (5)  loss of a fetus;
   (6)  permanent loss of use of a body organ, member, function or system;
   (7)  permanent consequential limitation of use of a body organ or member;
   (8)  significant limitation of use of a body function or system; or
   (9)  a medically determined injury or impairment of a non-permanent nature which prevents the injured

person from performing substantially all of the
material acts which constitute such person's usual
and customary daily activities for not less than
ninety days during the one hundred eighty days
immediately following the occurrence of the injury
or impairment.

N.Y. Ins. Law § 5102(d)(McKinney 2007).

To prevail on a motion for summary judgment, a
defendant must initially establish a *prima facie* case that the
plaintiff did not sustain a serious injury within the meaning of
New York's No-Fault Insurance Law.  See Gaddy v. Eyler, 591
N.E.2d 1176, 1177 (N.Y. 1992).  To meet this burden, the
defendant may rely on unsworn reports by plaintiff's physicians,
see McGovern v. Walls, 201 A.D.2d 628, 629 (2d Dep't 1994), but
reports by the defendant's own retained physicians must be in the
form of sworn affidavits or affirmations.  See Marsh v. Wolfson,
186 A.D.2d 115, 115-16 (2d Dep't 1992).  Once the defendant has
established a *prima facie* case that plaintiff has not suffered a
"serious injury" as defined under the statute, the burden shifts
to the plaintiff to provide sufficient evidence to support his or
her claim of serious injury.  Ebewo v. Martinez, 309 F. Supp.2d
600, 604 (S.D.N.Y. 2004) (citing Gaddy v. Eyler, 79 N.Y.2d 955,
582 (1992)).  Such evidence must be admissible evidence, in the
form of sworn affidavits or affirmations by physicians.  Barth v.
Harris, No. 00 Civ. 1658, 2001 WL 736802 (S.D.N.Y. June 25,
2001), at *2 (citing Bonsu v. Metro. Suburban Bus Auth., 202

A.D.2d 538 (2d Dep't 1994)).

To meet the serious injury threshold, the plaintiff must provide objective proof of his or her injury; subjective complaints of pain alone are insufficient to meet the burden. Toure v. Avis Rent A Car Sys., Inc., 98 N.Y.2d 345, 350 (2002). Objective proof may come in the form of: (1) "an expert's designation of a numeric percentage of a plaintiff's loss of range of motion;" or (2) "[a]n expert's *qualitative* assessment of a plaintiff's condition . . . provided that the evaluation has an objective basis and compares the plaintiff's limitations to the normal function, purpose and use of the affected body organ, member, function or system." Id. (emphasis in original).

The Court of Appeals has also stated that "even where there is objective medical proof, when additional contributory factors interrupt the chain of causation between the accident and claimed injury–such as a gap in treatment, an intervening medical problem or a preexisting condition–summary dismissal of the complaint may be appropriate." Pommels v. Perez, 4 N.Y.3d 566, 572 (2005). The court noted that although "the law surely does not require a record of needless treatment in order to survive summary judgment" where there has been a gap in or cessation of treatment, a plaintiff "must offer some reasonable explanation" for that gap or cessation. (Id. at 575.)

**C.   Consideration of Plaintiffs' Serious Injury Claims**

Of the categories of serious injury listed in section 5102(d), Maria Rand and Benjamin Rand claim to have suffered: (1) permanent loss of use of a body organ, member, function or system; (2) permanent consequential limitation of use of a body organ or member; (3) significant limitation of use of a bodily system or function; and (4) a medical injury or impairment preventing them from performing substantially all of their usual and customary daily activities for at least 90 of the 180 days following the collision.  (Maria Rand Decl. ¶ 14; Benjamin Rand Decl. ¶ 12.)

Because the Court finds that Maria and Benjamin Rand have each provided evidence sufficient to support their claims of "permanent consequential limitation of use of a body . . . member" and "significant limitation of use of a bodily system or function," the Court will not address the remaining categories for purposes of deciding defendants' summary judgment motion.  As the New York Court of Appeals has stated, "whether a limitation of use or function is 'significant' or 'consequential' (i.e., important . . .) relates to medical significance and involves a comparative determination of the degree or qualitative nature of an injury based on the normal function, purpose and use of the body part."  Dufel, 84 N.Y.2d at 798.  "Permanent consequential limitation" requires a greater degree of proof than "significant

limitation" because only permanent consequential limitation requires proof of permanency. <u>Altman v. Gassman</u>, 608 N.Y.S.2d 651 (1st Dep't 1994).

As a preliminary matter, defendants have submitted medical evidence sufficient to meet their burden of establishing that Maria Rand and Benjamin Rand have not met the serious injury threshold as defined in section 5201(d). The affirmed medical reports of Drs. Lechtenberg and Epstein for both Maria Rand and Benjamin Rand, based on the physicians' examinations of the plaintiffs and review of medical records, state that neither suffers from neurological or orthopedic injuries as a result of the July 24, 2003 accident. Thus, the burden shifts to plaintiffs to demonstrate that a genuine issue of material fact exists as to whether Maria and Benjamin Rand sustained serious injuries as a result of the July 24, 2003 accident.

Maria Rand has provided objective evidence of a serious injury through the report of Dr. Friedman, who states that although she had prior degenerative abnormalities in her cervical spine prior to the July 24, 2003 accident, the accident caused her to suffer from, *inter alia*, cervical myofascitis/spasm with right-sided radiculopathy, and aggravation of "prior totally clinically silent cervical multi-level osteophyte complexes." Dr. Friedman also noted a 33 percent limitation in the ranges of motion for her cervical spine on flexion, extension and rotation,

as compared to normal ranges of motion.  "While there is no set percentage for determining whether a limitation in range of motion is sufficient to establish 'serious injury,' the cases have generally found that a limitation of twenty percent or more is significant for summary judgment purposes."  Hodder v. United States, 328 F. Supp.2d 335, 356 (E.D.N.Y. 2004) (collecting New York cases).  The limitations in Maria Rand's range of motion for her cervical spine are thus significant.[2]

Additionally, the fact that Maria Rand's injuries may have been caused by an exacerbation of a pre-existing degenerative spine condition is not fatal to her case, as such exacerbations may still constitute a serious injury within the meaning of the No-Fault Insurance Law.  See Gentile v. Snook II, 20 A.D.3d 389 (2d Dep't 2005); Hazelton v. Brown, 248 A.D.2d 871, 873 (3d Dep't 1998).

_____

[2]  Defendants argue, based on a number of Appellate Division cases, that in order to defeat defendants' motion for summary judgment, plaintiffs must also proffer medical evidence, contemporaneous with the accident, establishing their initial range of motion restrictions.  (Defts' Reply Aff. ¶ 13.)  See, e.g., Thompson v. Abbasi, 15 A.D.3d 95, 98 (1st Dep't 2005); Lanza v. Carlick, 279 A.D.2d 613 (2d Dep't 2001); Passarelle v. Burger, 278 A.D.2d 294 (2d Dep't 2000).  Notwithstanding defendants' argument, the Court is not aware of, and defendants have not provided, any case in which a federal court has granted summary judgment on this basis.  Moreover, the Court finds that plaintiffs have provided evidence of recent examinations of Maria and Benjamin Rand showing restrictions in their ranges of motion. The absence of medical records showing similar restrictions in their ranges of motion immediately following the accident is not dispositive and is an issue of credibility and probative value best considered by the fact-finder.

In support of Benjamin Rand's claim to have suffered a serious injury, plaintiffs have provided the report of Dr. Bleicher, who found that as a result of the July 24, 2003 accident, Benjamin Rand suffered from "numerically and objectively determined restrictions of range of motion of the left shoulder, right knee, cervical and lumbar spine," including a 33 percent reduction in the range of motion for his lumbosacral spine, left side flexion.  Moreover, the evaluation of Dr. Epstein, submitted by defendants, also reveals a 33 percent reduction in the ranges of motion for Benjamin Rand's cervical spine (on flexion, extension, lateral bending, and lateral rotation) and his lumbosacral spine (on extension, lateral bending, and rotation), and a 22 percent reduction in the range of motion for his lumbosacral spine, on flexion.  These findings, along with Dr. Bleicher's findings of "accelerated post-traumatic osteoarthritis, muscular weakness and atrophy," provide objective evidence of a serious injury sufficient to defeat defendants' motion for summary judgment.

Plaintiffs have also provided a reasonable explanation for why they ceased treatment of their injuries, noting that: (1) the treatments were not achieving any significant improvements in their conditions, and (2) the financial cost was prohibitive. (Maria Rand Decl. ¶¶ 27–30; Benjamin Rand Decl. ¶¶ 19-22.) Although plaintiffs have not provided the Court with medical

evidence, contemporaneous with their discontinuation of treatment, that the treatment was no longer effective, their decision to discontinue treatment because of financial concerns is sufficient to survive summary judgment. See Shapurkin v. SSI Services FLQ, Inc., No. 03 CV 5240, 2005 WL 2002452, at *7 (E.D.N.Y. Aug. 19, 2005)(finding that plaintiff's explanation for cessation of treatment was reasonable where plaintiff "explained that he failed to pursue further treatment due to financial constraints and the termination of no-fault benefits").

In addition, the Court does not find merit in defendants' argument that plaintiffs "may not rely upon the affirmed medical reports of Dr. Bleicher and Dr. Friedman to the extent that they are based upon unsworn medical reports and MRIs." (Defts' Reply Aff. ¶ 19.) As an action removed to federal court, federal procedural and evidentiary law apply. See Williams v. Elzy, No. 00 Civ. 5382, 2003 WL 22208349, at *5 (S.D.N.Y. Sept. 23, 2003)(citing Hanna v. Plumer, 380 U.S. 460, 465 (1965); Nasrallah v. Helio De, No. 96 Civ. 8727, 1998 WL 152568, at *7 (S.D.N.Y. Apr. 2, 1998)(Sotomayor, J.); Citron v. Citron, No.00 CV 0815, 2002 WL 32096588 (E.D.N.Y. Oct. 5, 2002)). Pursuant to Rule 703 of the Federal Rules of Evidence, the affirmed reports of plaintiffs' experts, Drs. Bleicher and Friedman, may be based on facts "of a type reasonably relied upon by experts in the particular field in forming opinions or

inferences upon the subject," and these facts "do not need to be admissible in evidence." <u>Nasrallah</u>, 1998 WL 152568, at *7. Thus, "[a]n expert may rely . . . on hearsay if it is common in his field to do so. . . . Certainly it is common for treating physicians to rely on the interpretive reports of radiologists in making diagnoses without viewing the underlying scans themselves or requiring the radiologists to file affidavits." <u>Id.</u>

Accordingly, the Court finds that both Maria and Benjamin Rand have submitted sufficient evidence to support the existence of a genuine issue of material fact as to whether they sustained a "permanent consequential limitation of use of a body . . . member" or a "significant limitation of use of a body function or system." The discrepancy between the medical reports submitted by plaintiffs and defendants "raises questions of credibility best determined by a fact-finder." <u>Stephens v. Ford Motor Credit Co.</u>, No. 00-CV-6394, 2005 WL 2387589, at *6 (E.D.N.Y. Sept. 28, 2005).

### III. CONCLUSION

For the foregoing reasons, it is respectfully recommended that defendants' motion for summary judgment against plaintiffs be denied in its entirety.

Any objections to this Report and Recommendation must be filed with United States District Judge Dora Irizarry within

ten days of the date of its entry.  Failure to object within ten days of the date of entry of this Report and Recommendation will preclude appellate review by the District Court.  See 28 U.S.C. § 636(b)(1); Local Civil Rule 6.3; <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Small v. Secretary of Health and Human Servs.</u>, 892 F.2d 15 (2d Cir. 1989).  Any requests for extensions of time to file objections should be made to Judge Irizarry.


**SO ORDERED.**

Dated:  March 28, 2007
        Brooklyn, New York

                        _____/s/_____
                        **Kiyo A. Matsumoto**
                        United States Magistrate Judge
                        Eastern District of New York